ANGELA ALIOTO, (SBN 130328)
STEVEN L. ROBINSON, (SBN 116146)
**LAW OFFICES OF JOSEPH L. ALIOTO
AND ANGELA ALIOTO**
700 Montgomery Street
San Francisco, CA 94111
Telephone: (415) 434-8700
Facsimile: (415) 438-4638

Attorneys for Plaintiff
Brian Copeland

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **BRIAN COPELAND,** | CASE NO. 3:19-cv-00343-VC |
| Plaintiff, | First Amended Complaint for Damages: |
| vs. | 1. Employment Discrimination - Race - FEHA; |
| | 2. Employment Discrimination - Age - FEHA; |
| | 3. Tortious Discharge; & |
| **CUMULUS MEDIA CORPORATION, SAN FRANCISCO RADIO ASSETS LLC**, DOES 1- 10, | 4. Breach of Implied Covenant of Good Faith and Fair Dealing; |
| Defendants. | **JURY TRIAL REQUESTED** |

## I.   INTRODUCTION

1.  Plaintiff Brian Copeland is a talented, charismatic entertainer. He worked for many years for KGO Radio, which consistently refused to treat him fairly, solely on account of his race. When he was finally given an opportunity to host a talk show in prime time, he excelled. Defendant, however, never accepted him nor treated him fairly because of his race, ultimately firing him as part of a purge of

1

its older employees. This lawsuit concerns a single event, the termination of Brian Copeland's employment on January 12, 2018.

## II. PARTIES

2. Defendant San Francisco Radio Assets LLC is a corporation doing business within the State of California and was at all times relevant the employer of Plaintiff. Said Defendant is currently and at all times herein relevant affiliated with Cumulus Radio Corporation. Defendant San Francisco Radio Assets LLC will hereinafter be variously referred to in this First Amended Complain to as "Cumulus," "Defendant" or "KGO."

3. Venue in this Court is proper because the unlawful employment practices alleged herein occurred within the Northern District of California.

4. Plaintiff is ignorant of the true names or capacities of the defendants sued here under the fictitious names DOE 1 through DOE 10, inclusive. Plaintiff is informed and believes that each DOE defendant was responsible in some manner for the occurrences and injuries alleged in this complaint.

**5.** At all times mentioned in the causes of action into which this paragraph is incorporated by reference, each and every defendant was the agent or employee of each and every other defendant. In doing the things alleged in the causes of action into which this paragraph is incorporated by reference, each and every defendant was acting within the course and scope of the agency or employment and was acting with the consent, permission, and authorization of each remaining defendant. All actions of each defendant alleged in the causes of action into which this paragraph is incorporated by reference were ratified and approved by the officers or managing agents of every other defendant.

## III. EXHAUSTION OF ADMINISTRATIVE REMEDIES

6. Plaintiff has fully exhausted his statutory administrative remedies

## IV. STATEMENT OF FACTS.

7. Brian Copeland is an award-winning actor, comedian, author, playwright, television and radio host based in the San Francisco Bay Area.

8. Copeland began his show business career in standup comedy a few weeks after graduating from high school in 1982. He eventually worked his way up to comedy club headliner and opening act for artists including Aretha Franklin, Ray Charles, James Brown, Ringo Starr, Lionel Ritchie, Gladys Knight and Smokey Robinson in venues such as Caesar's Palace, the Universal Amphitheater and Constitution Hall in Washington, D.C. He has performed on MTV, A&E, NBC, VH1 and Comedy Central.

9. In 2004, Copeland debuted his first one-man play, *Not a Genuine Black Man* at the Marsh in San Francisco. The play explored his childhood experience as a member of one of the only African American families then living in the then 94% white suburb of San Leandro, California. His tale of laughter, tears and sociology went on to become the longest-running solo show in San Francisco theatrical history with more than 800 performances. The show has been performed in more than 30 cities, including a critically acclaimed run Off Broadway.

10. To date, Copeland has written and performed four subsequent critically acclaimed solo plays, including *The Waiting Period* (2015 Theater Bay Area Award for Outstanding Production of a Solo Play), the hit Christmas show *The Jewelry Box*, *The Scion* (PBS Affiliate KQED'S Best New Play of 2014) and *Grandma and Me: An Ode to Single Parents*, which will debut in San Francisco in the spring of 2019.

11. In 2006, Copeland wrote a book based on *Not A Genuine Black Man* that became a bestseller and is required reading at a number of high schools, colleges and universities across the country

**Copeland v. Cumulus Media Corporation**
First Amended Complaint for Damages                                                                 3

12. Copeland has hosted programs on just about every local television station in the San Francisco Bay Area, the country's sixth largest media market. This includes, among others, KTVU (a five year stint as co-host of Mornings on 2), ABC7 (host of the Emmy award-winning 7live) and KNTV (the hit 2015 late night special *Now Brian Copeland,* which was simulcast on the NBC affiliates in Los Angeles and San Diego*).*

13. As a child, Copeland was a listener and frequent caller to the late night show of the legendary Al "JazzBeaux" Collins on KGO. Copeland was, and is, an expert comic book collector. He frequently called in to share his expertise. Collins even had the teenaged Copeland co-host with him on a few occasions.

14. Copeland began his professional radio career at "Live 105" where he appeared as comic/co-host once a week on the Alex Bennett Show from 1986 to 1991.

15. DJ Sam Van Zandt gave Plaintiff a slot on his Sunday show on KSAN, which was known as "Copeland Corner" in which Plaintiff wrote, produced and recorded comedy bits and sketches.

16. In 1991, Oakland Tribune television/radio columnist Bill Mann heard an edition of Copeland's Corner. Mann requested a tape of the piece and sent it to Ronn Owens at KGO. Owens played the bit on his show and, as a result of the overwhelming response, Copeland was hired to fill in for Owens and others when they were absent. Copeland stayed in that role for three years, from 1991 until 1994 when he was given his own show. Even after getting his own show, Copeland continued to fill in for prime time hosts, eventually becoming the primary fill in host for Owens' top rated show.

17. In September 1994, Copeland got his own show on Saturday mornings from 10:00 a.m. to 12:00 p.m. Copeland had this slot for about a year, when he was moved to Saturdays from 4:00 to 7:00 p.m.

18. From 1997 through 2011, Copeland had a show on Sunday mornings. Initially the slot was from 9:00 to 10:00, then a second hour was added and, later, a third hour was added, so that Copeland was working from 8:00 to 11:00 a.m.

19. Sunday mornings are, historically, not the most listened to slots in the weekly schedule. Even so, Copeland worked diligently to book interesting guests and to discuss timely topics. Copeland's hard work paid off with high ratings.

20. KGO has 50,000 watts and a very strong signal. For more than three decades prior to the purchase of KGO by Cumulus Radio Corporation in 2011, KGO News Talk 810 was the number one radio station in the Bay Area market. At its peak, KGO billed as much as $ 30 million a year.

21. Following the purchase of KGO by Defendant Cumulus, management engaged in a purge of its on air talent. On December 1, 2011, it fired seven hosts ( Gene Burns, John Rothmann, Bill Wattenberg, among others), all of whom were in their sixties.

22. In the wake of the purge of the bulk of its on air talent, Cumulus executed a format change. With the exception of Ronn Owens, one of the purge's few survivors, and on the weekend, KGO abandoned its decades old news talk format and became a news only station. However, it tried to do so on the cheap, without allocating the necessary resources to cover local stories. Cumulus went so far as to contract out traffic reporting to a Texas-based service, often resulting in inaccurate, untimely or garbled traffic reporting such as warning listeners of a slowdown approaching the "Golden Bay Bridge."

23. Following the purchase of KGO by Cumulus, Copeland was removed from his Sunday morning slot and placed on Sunday afternoon, from 1:00 to 4:00 p.m. Copeland was replaced by less experienced, non African American males. KGO management told Copeland that "you have to earn the Sunday morning slot,"

even though Copeland's work had built up the ratings for Sunday mornings. Sunday afternoon, by contrast, is a talk radio graveyard as anyone in that slot must compete with football.

24. Copeland would be consigned to the Sunday afternoon graveyard from 2011 to early 2016. During that time, three Caucasian males would rotate through the Sunday morning slot, The first was a sportstalk jock, with no experience in newstalk. The second was Ethan Bearman. At the time he started on the Sunday morning slot, Bearman's prior radio experience had been at a micro radio station in Capitola, California. The Program Director told Bearman to listen to Copeland's broadcast and to follow his example. The third successor to Copeland was more experienced than the prior two Caucasians, except he was not local as he was based out of San Diego.

25. During the time Copeland was working the Sunday afternoon graveyard, he was not allowed to fill in for Ronn Owens, with that role being given to the sportstalk jock who had replaced him on Sunday mornings. When Owens was absent due to a hospitalization in 2014, Copeland again became the primary substitute for Owens. Before the Cumulus takeover of KGO, Copeland was the primary host allowed to fill in when Owens was absent.

26. The change to all news programing proved to be a ratings fiasco for the once high flying KGO. By April 2, 2016, management returned the station to a talk radio format.

27. In late 2015, Plaintiff approached KGO station management and requested that he be given a prime time (week day) slot. Management agreed and entered into a written employment agreement with Plaintiff. On April 2, 2016, Copeland started his daily slot of Monday through Friday, 2:00 to 4:00 p.m.. Copeland was the first African American to host a prime time slot in the station's fifty year

history in the newstalk format. African Americans had in the past only hosted shows during the late night or on weekends.

28. Program Director Mike Anthony discouraged hosts, such as Copeland, from talking about hard news subjects but instead mandated them to do "feature" programing with a focus on what he called the "7 Fs," ("Fashion, fun, food etc"). What this meant in practice is that hosts would be talking about such things as dating or fashion styles and not about the news of the day. Copeland studiously followed the news of the day and attempted to modify his show based upon any important breaking stories. Most of the other hosts were nowhere nearly so flexible, especially Ethan Bearman. who by the time Copeland had his daily show was working in the slot after Owen. Bearman was often heard prattling on about one of the 7 Fs notwithstanding breaking stories, such as mass shootings, that the rest of the media was focused on.

29. In a departure from prior station practice and, indeed, industry practice, Anthony never showed Copeland or other hosts their ratings. Copeland repeatedly asked Anthony for his show's ratings. Although Anthony frequently responded by stating "I will get them to you." He never did. In fact, on more than one occasion Anthony said "We don't care about ratings" and "we care more about demographics."

30. Anthony and other KGO management did not think highly of KGO's listenership demographic, notwithstanding the fact that the audience was fiercely loyal to KGO and had kept the station "number 1" in the ratings for decades. KGO managers derided the station audience as being too old and less desirable than an audience with a younger demographic. KGO managers often joked whenever they saw a hearse that KGO "has just lost another listener."

31. Plaintiff's co-worker and fellow host, Pat Thurston, repeatedly asked for a

daytime slot. During Plaintiff's tenure and, upon information and belief, thereafter, KGO's management repeatedly refused. Program Director Anthony told Thurston "We are trying to attract women listeners but women won't listen to women." With that, Thurston remained consigned to weekends.

32. Copeland never received any editorial criticism during his tenure with KGO.

33. Prior to Cumulus Radio Corporation filing for Chapter 11 Bankruptcy, Cumulus CEO Mary Berner visited the KGO station. Berner told the employees of the impending bankruptcy and assured them it was solely to reduce corporate debt levels and there would be no layoffs.

34. Copeland proved to be a very popular and beloved talk show host at KGO. Speculation abounded both within and outside the station that Copeland would succeed the venerable Ronn Owens in his morning slot when Owens retired,

35. In January 2018, Copeland was preparing for the Martin Luther King Day broadcast. He prerecorded the show, which featured segments with Congresswoman Barbara Lee and the Reverend Amos Brown, President of the San Francisco NAACP and a friend of Martin Luther King. By January 12, the segment had been fully recorded. The segment would never be aired.

36. After Copeland's show on January 12, was done, he was ushered into the office of Program Director Mike Anthony. When Copeland got there, Anthony told him his employment contract was being terminated. The stated reason was "Your ratings were not what we had hoped they would be."

37. Copeland was replaced by a Caucasian, Dr. Drew, In a syndicated program, on Martin Luther King Day 2018.

38. Two other longtime KGO employees suffered severe adverse employment actions on January 12, 2018. Ronn Owens was removed from his morning show of 42 years and given an eight minute pre-recorded segment that would run each

1  day. Owens' producer was fired, along with Copeland. All three employees were in their late forties or older.

39. Ronn Owens was replaced in his weekday morning segment by Ethan Bearman, a much younger man broadcasting out of Los Angeles but pretending to be in San Francisco. Following Copeland's firing, there were no other African American hosts on KGO air.

## V. CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### (Race Discrimination in Violation of FEHA)
### Cal. Gov. Code § 12940(a)

40. Plaintiff incorporates by reference all of the allegations contained in paragraphs 1 through 39 with the same force and effect as if fully pleaded at length herein.

41. Jurisdiction in this court is invoked pursuant to California Government Code §§ 12900, 12921, 12926, 12940 and 12965 [Collectively referred to as "FEHA"].

42. Copeland's job performance was always satisfactory and was usually excellent.

43. Defendant terminated Copeland's employment on account of his race, as evidenced by the fact that before him, there had never been an African American regularly scheduled to host a prime time program on KGO during its 50 year history in the talk radio format and after the termination of his employment, Defendant employed no African Americans as regularly scheduled program hosts.

44. Plaintiff is informed and believes and thereon alleges that this cause of action is not preempted by the California Workers' Compensation Act on the grounds that discrimination on the basis of race is not a risk of employment.

45. As a result of the aforesaid discriminatory discharge, Plaintiff has suffered and is continuing to suffer a loss of wages/salary, benefits and other employee compensation in an amount which is currently unascertained. Plaintiff faces

1  substantial diminution of his future earning capacity in an amount which is also currently unascertained. Plaintiff will request leave of the court to amend this Complaint to state the amount of all such damages when they have been ascertained or upon proof at the time of trial.

46. As a result of the aforesaid act of discrimination, Copeland has been held up to great derision and embarrassment with fellow workers, friends, members of the community, listeners, fans and family. Copeland suffered and continues to suffer emotional distress because Defendant demonstrated to him that it would not recognize nor accept him as an on air newshost solely because of his race. Defendant acted unreasonably because it knew and/or should have known that its conduct was likely to result in additional, severe mental distress. Plaintiff Copeland therefore seeks damages for such emotional distress in an amount to be proven at time of trial.

47. Because of the discriminatory act by Defendant as herein above alleged, Plaintiff has been and will in the future be required to employ physicians and surgeons to examine, treat and care for him and will incur additional medical expenses in an amount to be proven at the time of trial.

48. In doing the act set forth above, Defendant acted as herein alleged with a conscious disregard of Copeland's right to employment notwithstanding his race. Defendant, in utter disregard of its obligation under the law, acted with the malicious intention of removing him from the work place. The officers and managing agents of Defendant made a conscious decision not to comply with the law of this state and purposely chose to discriminate against Copeland on account of his race. The Plaintiff is therefore entitled to an award of punitive damages in an amount to be proven at trial.

49. In bringing this action, Plaintiff has been required to retain the services of

counsel. Pursuant to California Government Code § 12965(b), He is entitled to and hereby requests an award of attorney and expert witness fees and costs of suit.

## SECOND CAUSE OF ACTION
### (Age Discrimination in Violation of FEHA)
### Cal. Gov. Code § 12940(a)

50. Plaintiff incorporates by reference all of the allegations contained in paragraphs 1 through 39 with the same force and effect as if fully pleaded at length herein.

51. Jurisdiction in this court is invoked pursuant to California Government Code §§ 12900, 12921, 12926, 12940 and 12965 [Collectively referred to as "FEHA"].

52. Copeland's job performance was always satisfactory and was usually excellent.

53. Defendant terminated Copeland's employment on account of his age, as evidenced by the fact that on January 12, 2018, he was discharged simultaneously with substantial adverse employment actions taken against two other older employees and by the fact that the Defendant, on two separate occasions, had previously terminated large numbers of older employees at the same time.

54. Plaintiff is informed and believes and thereon alleges that this cause of action is not preempted by the California Workers' Compensation Act on the grounds that discrimination on the basis of age is not a risk of employment.

55. As a result of the aforesaid act of age discrimination, Plaintiff has suffered and is continuing to suffer a loss of wages/salary, benefits and other employee compensation in an amount which is currently unascertained. Plaintiff faces substantial diminution of his future earning capacity in an amount which is also currently unascertained. Plaintiff will request leave of the court to amend this Complaint to state the amount of all such damages when they have been ascertained or upon proof at the time of trial.

56. As a result of the aforesaid act of age discrimination, Copeland has been held up

to great derision and embarrassment with fellow workers, friends, members of the community, listeners, fans and family. Copeland suffered and continues to suffer emotional distress because Defendant demonstrated to him that it would not recognize nor accept him as an employee solely because of his age. Defendant acted unreasonably because it knew and/or should have known that its conduct was likely to result in additional, severe mental distress. Plaintiff Copeland therefore seeks damages for such emotional distress in an amount to be proven at time of trial.

57. Because of the wrongful act of age discrimination by Defendant as herein above alleged, Plaintiff has been and will in the future be required to employ physicians and surgeons to examine, treat and care for him and will incur additional medical expenses in an amount to be proven at the time of trial.

58. In doing the act set forth above, Defendant acted as herein alleged with a conscious disregard of Copeland's right to employment notwithstanding his status as an older employee. Defendant, in utter disregard of its obligation under the law, acted with the malicious intention of removing him from the work place. The officers and managing agents of Defendant made a conscious decision not to comply with the law of this state and purposely chose to discriminate against Copeland on account of his age. The Plaintiff is therefore entitled to an award of punitive damages in an amount to be proven at trial.

59. In bringing this action, Plaintiff has been required to retain the services of counsel. Pursuant to California Government Code § 12965(b), He is entitled to and hereby requests an award of attorney and expert witness fees and costs of suit.

**THIRD CAUSE OF ACTION**
Tortious Discharge
Common Law

**Copeland v. Cumulus Media Corporation**
First Amended Complaint for Damages                                                                 12

60. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 5, and Paragraphs 7 through 49 supra with the same force and effect as if fully pleaded at length herein.

61. The jurisdiction of this court is invoked pursuant to the holding of **Tameny v. Atlantic Richfield Company** (1980) 27 Cal. 3d 167.

62. There is a fundamental, well established public policy in this state against discrimination in employment based upon age.  **Stevenson v. Superior Court** (1997) 16 Cal. 4th 880, 893-898.

63. At all times herein relevant, Plaintiff's job performance was always satisfactory and was usually excellent.

64. Defendant discharged Plaintiff from employment because of his age and because of his association with a demographic of older individuals (i.e, people over the age of fifty) who were long time listeners to KGO radio. The disdain of Defendant's management toward its older listeners evidenced an age based animus among Defendant's top executives and other managing agents that led to the discharge or demotion of those employees who were identified in the eyes of said executives and managing agents with the disfavored demographic of older listeners, including the Plaintiff herein, among others.

65. Further evidence of this discriminatory intent toward older employers is the fact that two other employees were fired or subjected to severe adverse actions the same day as Plaintiff.  Still further evidence of such animus is the fact that the Defendant, on two separate occasions, had previously terminated large numbers of older employees at the same time.

66. Plaintiff is informed and believes and thereon alleges that this cause of action is not preempted by the California Workers' Compensation Act on the grounds that discrimination on the basis of age is not a risk of employment.

**Copeland v. Cumulus Media Corporation**
First Amended Complaint for Damages                                                                 13

67. As a result of the aforesaid act of discrimination, Plaintiff has suffered and is continuing to suffer a loss of wages/salary, benefits and other employee compensation in an amount which is currently unascertained.  Plaintiff faces substantial diminution of his future earning capacity in an amount which is also currently unascertained.  Plaintiff will request leave of the court to amend this Complaint to state the amount of all such damages when they have been ascertained or upon proof at the time of trial.

68. As a result of the aforesaid act of discrimination, Copeland has been held up to great derision and embarrassment with fellow workers, friends, members of the community, listeners, fans and family. Copeland suffered and continues to suffer emotional distress because Defendant demonstrated to him that it would not recognize nor accept him as an employee solely because of his age.   Defendant acted unreasonably because it knew and/or should have known that its conduct was likely to result in additional, severe mental distress.  Plaintiff Copeland therefore seeks damages for such emotional distress in an amount to be proven at time of trial.

69. Because of the aforesaid discriminatory act by Defendant on January 12, 2018,  as herein above alleged, Plaintiff has been and will in the future be required to employ physicians and surgeons to examine, treat and care for him and will incur additional medical expenses in an amount to be proven at the time of trial.

70. In doing the act set forth above, Defendant  acted as herein alleged with a conscious disregard of Copeland's right to employment notwithstanding his status as an older employee. Defendant, in utter disregard of its obligation under the law,  acted with the malicious intention of removing him from the work place.  In addition, Defendant, its  officers and managing agents have knowingly retained, coddled and protected vicious employees known to either be hostile

toward older employees and/or known by the management of Defendant to disregard the laws prohibiting discrimination in employment. The officers and managing agents of Defendant made a conscious decision not to comply with the law of this state and purposely chose to discriminate against Copeland on account of his age. The Plaintiff is therefore entitled to an award of punitive damages in an amount to be proven at trial.

### FOURTH CLAIM FOR RELIEF
Breach of Implied Covenant of Good Faith and Fair Dealing
Common Law

71. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 5, and Paragraphs 7 through 39 supra with the same force and effect as if fully pleaded at length herein.

72. Pursuant to the contract between the Defendant and Copeland, there was an implied promise of good faith and fair dealing. This implied promise meant that each party would not do anything to unfairly interfere with the right of the other party to receive the benefits of the contract or that the employment of Plaintiffs would not be terminated for illegal or fraudulent reasons.

73. Plaintiff did all, or substantially all, of the significant things that the contract required him to do. Specifically, at all times herein relevant, the Plaintiffs' job performance was always satisfactory and was usually excellent.

74. Defendant did not deal with Plaintiff Copeland in good faith nor did it deal fairly with him. This is evidenced by the repeated failure, throughout Copeland's employment, to show Copeland the ratings for his program.

75. The refusal of Defendant to act in good faith and/or to deal with Copeland in good faith is evidenced by its discharge of Plaintiff from employment.

76. As a result of the wrongful, bad faith discharge of the Plaintiff from employment by Defendant, Plaintiff has suffered and is continuing to suffer a loss of

wages/salary, benefits and other employee compensation in an amount 'which is currently unascertained. The Plaintiff's job history is now blemished as a result of the wrongful action of Defendant. The ability of the Plaintiff to obtain employment at a salary comparable to his position with Defendant is thus doubtful and given the nature of the San Francisco Bay Area Radio market, nearly impossible. He therefore faces a substantial diminution of his future earning capacity in an amount which is currently unascertained. Plaintiff will request leave of the court to amend this Complaint to state the amount of all such damages when they have been ascertained, or upon proof at the time of trial.

*****

Plaintiff hereby demands a trial by jury.

*****

Plaintiffs hereby request this court grant them the following relief:

(1) Compensatory damages according to proof;

(2) Damages for emotional distress;

(3) Punitive and exemplary damages;

(8) Reasonable attorney fees;

(9) Expert witness fees; and

(10) Costs of suit.

Date: April 23, 2019				LAW OFFICES OF JOSEPH L. ALIOTO
						& ANGELA ALIOTO


						   /s/ *Steven L. Robinson*
						Steven L. Robinson
						  Attorney for Plaintiff

**Copeland v. Cumulus Media Corporation**
First Amended Complaint for Damages                                                  16